Good morning, and may it please the court. I have already communicated to your deputy clerk that I'm reserving three minutes for rebuttal, and we have already calculated that on the clock. Thank you. May it please the court. Akal Security is a private security company with lucrative contracts through the U.S. Marshal's Office to provide security services for numerous courts throughout this country, including this very circuit court, as well as specifically the Gerald R. Ford Federal Courthouse in Grand Rapids, Michigan. Kathleen Wierengo was a court security officer from 2002 to 2008 employed by Akal Security. There are two aspects to this case, one which is a motion for summary judgment, the second which is the motion to compel. I will address the issues of the motion for summary judgment first. As in any security operation that is based on a paramilitary format, the chain of command becomes critical. And in 2006, when CSO Wierengo realized that complaints needed to be made, she went through her chain of command. Her chain of command advised her, the first lead CSO said, we don't take complaints. The second chain of command, her site supervisor said any of our sexual harassment or discrimination materials are junk, and they simply were thrown out. She had the opportunity to meet someone higher up in the chain of command. That was a contract manager, Stark, from Chicago, who worked directly for Akal Security. She met him on November 20th during what was purported to be an interview for a job position, a promotion that she sought. In that interview, which lasted 50 minutes, she was berated, she was intimidated, and she was threatened, and she was told, anything in this meeting will not to have a communication with Akal Security in New Mexico, contacted them. She was advised, we don't have an employee handbook, and we don't have a grievance procedure in place for the Grand Rapids office. And what year is this? I'm sorry? What time frame is this? This time frame is taking place from late 2006 to the beginning of 2007. And the reason, Your Honor, it is important is because she was... It sounded like initially you were talking about some things that happened at the inception of her employment, but you were not. Is that right? Your Honor, one of the issues which arose is, I believe you're referring to the promotional issues that took place from 2004 to 2006. Those issues were simply culture and the climate that was created at the Grand Rapids court by the lack of respect for any policy or procedure by Akal Security. So we are not contending that those are actionable today, but we are saying that they give direction to this court as to being able to see how things were done in Grand Rapids. And the reason this is important moving to 2007, because she was carrying the secret shame of having been sexually assaulted by a fellow CSO within the court building in Grand Rapids. After she summoned up the courage to report this, realizing the implications of reporting this in that type of environment, she found that Akal Security failed to follow its own procedures to investigate complaints immediately, impartially, and confidentially. What's your best argument in terms of an adverse employment action? What's the one you feel the best about? Your Honor, I believe that the best argument for that is the fact that the culture created by Akal Security, where complaints were not tolerated, where every time she made any comment to anybody about a complaint, she was told that that was not going to happen. And when she did report the sexual assault, Your Honor, she was met with a 30-day suspension. She was placed on leave. She was stripped of her credentials. She was stripped of her gun. And within a culture, Your Honor, where respect... Well, the incident where she was suspended didn't arise immediately from her reporting the incident, did it? Your Honor, I would submit that it did arise based on her reporting the incident, because she reported the incident, and then shortly after that, she had contact with the Federal Protective Services, the FBI, and they took steps to seek to remove the perpetrator from the building. However, there was repeated violations by him. There were two violations of him. And that caused her to realize all of her fears that were built up by the treatment she had received up to that point were now going to be brought full bore against her. All of the fears of what? I'm sorry? All of the fears of what? The fears that she would be retaliated against, that she would be basically ostracized, that they would not, in a setting such as this, not have her back. Okay, so the day after she reported it, he was transferred, right? He was removed from the district court to the bankruptcy, which in Grand Rapids is several blocks down the road. He was also ordered, Your Honor, by FBI and Federal Protective Services to have no contact with her, which he did on two separate occasions. But as soon... When she reported that he was still parking in the same place, they changed where he was parking, right? They did. Well, let me just ask you this. What should they have done that they didn't do? That's probably a better question. Well, I would submit that when the incidences in December of 07 occurred, she was immediately removed from her employment as a CSO for allegedly assaulting damaging property and cursing or swearing in a public lobby. She was simply removed from her employment. But that wasn't a cause decision. That was the Marshal's decision, right? To remove her from employment? Yeah. That was the... To remove her from anything over there. That was the Marshal's decision, Your Honor, after we contend that a call set the plate, if you will, by conducting a faulty investigation, what we submit as a failed investigation as to the true nature of what, in fact, happened that day, which we would submit as a fact question for a jury to decide after hearing all the evidence and seeing all the evidence. But it is our contention that when they failed to remove the CSO perpetrator from the building and from employment, he was still there, he was still present, and he was still impacting upon her. Did you or your client provide information to the Marshal's service to complete the picture? I mean, it sounded like you were just saying the Marshal's service had an incomplete picture of what happened. Did you all write a letter or do anything to approach them? Because they're not a defendant, right? They weren't sued. They are not, sir. Okay, so what did you do to make sure that the Marshal's service had all the information? Your Honor, when she was suspended in December of 2007 for the incidents, as I just referenced, she was removed from the building. She was put on indefinite leave and had no contact with anyone for 23 days. Judge Sutton's question to you. I'm sorry? What efforts you made to inform the Marshals of her side of the story, what efforts she made. Your Honor, with all due respect, the delay in telling her why she was suspended, she was not told why she was suspended. I mean, I don't mean to interfere in Judge Sutton's question, but this is completely unresponsive to what he asked you. You said in response to Judge White that the Marshal's service said, we don't want you to use her anymore. And that was a problem because they had no other work, so if they had no other work and they couldn't use her for the Marshal's service, she had to go. Your response to that was, well, the Marshal's service had an incomplete picture because the investigation by the defendant wasn't well done. And I'm saying, okay, fine, let's accept all of that. Did you tell the Marshal's service your side of the story? Our client told the Marshal's service her side of the story after she was advised that she was being terminated. And the problem that I want to emphasize, and I don't mean this to sound disrespectful to what the court is saying, she was never told why she was suspended. They did not interview her for 23 days later. She had no idea why they were suspending her. And then she was terminated right after that. She did file a letter of appeal. She did explain to them what happened. And beyond that, there was no communication with the Marshal's service. But didn't she, she didn't deny that she was sort of cursing and very upset in the public area, did she? She, she indicated that she could not recall whether she said anything in the public area. Because Your Honor, 23 days later, she did not perceive this as an incident giving rise to her suspension. She had no idea why she was being suspended. So when she said that she didn't recall what she said, she honestly believed that. And but then what is the, she says, I don't recall. And then there are witnesses that say they heard and saw it. And there's surveillance footage. Your Honor, the lack of a viewable videotape is one of the issues that we raised on the motion to compel. And we would suggest to you that one of the, that the key investigator, Mr. Wood, we cited in his, in your, in our, in our brief, that he indicated that he had a copy of that on his computer that was viewable on his computer. And by being able to view that and show that to the jury, they would be able to see that the actions in the hallway of a very narrow control room with a large man and a slim woman standing against the wall, trying to allow him to go through, that she did not in fact bump him, that she may have touched him. She acknowledged that there may have been touching, but that was not an assault that, that if there was contact, it could be attributed to him as well as to her. And as the video would show, we would suggest there was no evidence that she, when she walked out of that control room to the elevator where the witness said he heard this cursing, that she was doing anything except having her head down, heading to the elevator to go out for her appointment. But forget about that. That's sort of some of that petty stuff that was going on between all of them who pushed who touched me. But if you have somebody in a uniform and a gun, who's excited and cursing in a public space, I mean, isn't that what motivated the discharge or the suspension? Your Honor, I, I believe that that went to the motivation is, and it's because they believe that she did what was said, but it is our contention and it's been... A call, a call representative recommended that she be suspended for five days, as I recall, which seems pretty mild under the circumstances. If a call had a basis to believe that she cursed in a public area, it was the marshals, not a defendant, who determined that this was a defense for which she could be terminated, should be terminated, correct? Your Honor, I would suggest that a call realized that if they were to go in and say she assaulted a fellow CSO, she cursed in a public hallway. They proved that she didn't damage the door as these eyewitnesses supposedly said that she did. But they knew that if they said, let's give her five days, that if they told the U.S. Marshals what they told her, that, that Chief Firstall, who was the person who made that decision, would have had the platter placed in front of him. He would have looked at it and said, yep, that's enough. She's got to be gone and let her go and not accept that five days, lifting the responsibility for her termination from a call security, placing it on the U.S. Marshals and say, we had to do what we had to do. Are there further questions? All right, we'll hear from Mr. Pedersen. Thank you, Your Honor. Good morning. May it please the Court. Judge Sutton's question, what is plaintiff's best argument? Plaintiff's appellant said, our best argument is that we told about complaints and they were not tolerated. This case should be about sexual harassment complaints. The record shows that the only complaint about sex harassment came in a letter dated February 19th. Prior to that, plaintiff told me in deposition under sworn testimony, she had not complained about sexual harassment. So I invite the Court to take very close scrutiny of the actual record rather than argument as to a complaint. If she's complaining to the chain of command about things that are being done, that are obviously being done because she's a woman, does she have to use the word sexual harassment? Your Honor, I would say that there's no evidence in the record that anything that was being done apart from sex harassment was because she was a woman. That's the fundamental problem with the case. When plaintiff's appellant claims, for example, that someone said, we don't have a handbook. In plaintiff's appellant's argument, it's like, therefore, it must be because I'm a woman. Ignoring the record evidence that this company does not have a handbook, they do not have a grievance procedure because they were not unionized here. What was that in response to? What was her, that was in response to what particular complaint? Great question. Something that's overlooked by plaintiff's appellant. Plaintiff got the answer as to whether it was a handbook and a grievance procedure after she complained about sexual harassment. The communication where the company said, we don't have a handbook at that location and we don't have a grievance procedure, that came on March 1st, 2007. Plaintiff filed her first complaint of sexual harassment in February. So in response to a complaint about sexual harassment, she's already complained. Then the plaintiff said, well, is there a grievance procedure? Is there a handbook? No, there is not. We do not have a unionized facility. So it's all a red herring. And the plaintiff trained, excuse me, Your Honor. Did somebody employed by that company complain about problems in the workplace that they feel are motivated by sex discrimination or harassment or hostile environment? Every CSO, including the plaintiff appellant, is upon hire given a calls sexual harassment policy. Ms. Warango admitted that. Thereafter, two times in addition to her hire, she was given the policy again and signed for it. Plaintiff appellant admitted that. In addition, in December of 2006, plaintiff and all CSOs were told about a new hotline that the company instituted so anybody could call for any problem, including harassment. When was she told that the policy is a joke or isn't real? There's no evidence that anybody told her the policy was a joke. Rather, what the record evidence shows, according to plaintiff appellant, is that some of the training material was, according to somebody, a joke. No evidence as to why that person thought it was a joke. Bad graphics, bad PowerPoint, there's just no evidence of that. And, Your Honor, I would also submit that the material and evidence that was allegedly a joke by some person, that material was used in the training sessions that plaintiff appellant gave to her fellow CSOs on sex harassment, which included instructions on how to complain about sex harassment. There's no question in the record that Ms. Warango knew how to complain, instructed people how to complain, but failed to complain about sex harassment until, at the earliest, her letter of February 19, 2007. So that was the first complaint you're saying? That's what she told me under oath. Okay, and then immediately they did an investigation? Absolutely. What about the sort of overall feeling that she complains, they investigate, they decide, basically nothing happens to him, and then as soon as she does something, they're all over it? I would respectfully disagree with the assessment that basically nothing happened to him. It is undisputed that immediately, the day that she brought to FPS, Federal Protection Services, attention, an alleged assault some six months earlier, that he was immediately removed from the work site and never returned to that work site. Why is she complaining to FPS? I'm a little, I'm a little, I mean, FPS is not her employer. FPS is a separate entity, and the contractor with a call is the Marshals, right? You are correct, Your Honor. I can't answer that. I don't know. She knew how to complain to a call because she had written a letter in December saying, I was passed over for three promotions, and now we see in the brief we're up to seven, and she wrote a letter in February, and according to just now, counsel said she complained all the time to a call. So I don't know why she complained to FPS. FPS has nothing to do with her or her employment, other than you might have FPS personnel working at the same site, but they have nothing to do with her or her employment, correct? True, absolutely true. That's in the record, I would assume. It is, and speaking of FPS, there's a talk in the brief about the video cameras that failed to, or that could have captured the alleged incidents in the parking lot, where after Ms. Waringo complained and Mr. Quist was removed and told to go to the bankruptcy court, that on two different occasions after that, Mr. Quist was in a parking lot and drove by her. Is that all that happened? I thought the point was that there was more of an encounter than that. According to the record and according to the district courts, both instances were trivial. The first instance was where Ms. Waringo was exiting the parking lot for the day and Mr. Quist was standing at the booth where the security guard stands to check people in and out, and he was talking to the guy, and as Ms. Waringo came up, Mr. Quist was standing there, and Ms. Waringo had to pass by. That's incident one. Incident two, second time Ms. Waringo and fellow CSO Kritschkow are leaving the building for the day, and as they leave the building and they're in the parking garage, Mr. Quist drives his car by. According to Mr. Kritschkow, not too close, close but not too close. As the district court noted, none of those actions, there's not a shred, not even a suggestion, well I guess there's a suggestion, there's no evidence that either of those happened because of sexual motivation or sex harassment. As this court stated in Mullins v. Goodyear, it was a very, very similar case. Complaint of sex harassment, the employer did an investigation and took some action. One of the things the employer did in that case, they said to the accused supervisor, look, stay out of the work area where the plaintiff works, okay? And there were a couple of occasions where the alleged harasser came back to the work area and had some contact, including one time allegedly drove a forklift past her. Close but not too close. Court said, we refuse, as a matter of law, to hold that failure, if you want to use that word, to totally separate an accused from an accuser, shows that the employer did not take a prompt remedial action, where there's no evidence that there was sexual harassment in those subsequent contacts. That's Mullins v. Goodyear. That's exactly what we have here. There's no evidence that any of those contacts had any sexual motivation. There's just no record evidence. There's also, Judge Sutton, you asked counsel if Ms. Warango told the United States Marshal Service her side of the story. Eventually, that question was answered, I think, in a positive. It should have been answered in a positive. Because not only did the Marshal Service get the initial report, this is as to the December 17th incident, not only did the Marshal Service get an initial report and then they made their decision, but then a call wrote and advised Ms. Warango of the initial decision and said, by the way, you have an appeal right. Ms. Warango drafted an appeal, sent the appeal to a call. A call sent that appeal letter, her own written letter, to the Marshal Service. She told her story again. By the way, in that story she said she could have bumped into the CSO in the break room and she could have sworn. The Marshal Service got that letter and Mr. Firstall looked at that and said, I am still not convinced. I stand by my story. So the short answer to your question, Your Honor, is yes, they did submit that and the Marshal Service maintained their position. Let me just ask you a question. There are complaints about shunning and stuff like that. How many women were there? In the courthouse? Yes. That's not on the record. I don't know how many women there were in the courthouse. In this group? In the CSO group at that time? Yes. Kathy Warango was the sole female CSO in that group. Okay, so you have a situation where after this she claims that they're not talking to her. They're kind of giving her a hard time and just sort of ostracizing her. And our reaction is supposed to be, look, this is, you know, minor workplace, whatever. The same thing. She's going out the door. She feels the guy's late. You have a narrow door. He's a big guy. She's not a huge woman. So what if she bumps into him? What, they don't bump into each other? I mean, and then that gets turned into some sort of assault where she's going to be disciplined over it. He's complaining over it. I mean, it seems like there's somewhat of a double standard here. A couple comments in response to your question, Your Honor. First of all, no one ever concluded there was an assault. That is a word that the plaintiff uses. No one ever concluded that. Second, clearly in the Sixth Circuit and in other circuits, the court's role is not to say, gee, that was too tough or, gee, that was too mild. Your ultimate decision was a little harsh or a little petty. That, of course, is not the court's job. The court's job instead is to look at the marshal service's conclusion, and it calls here, and say, is there evidence that what they did, whether we would agree with it, reasonable minds might differ, the question is, was it because of protected activity? The record is without exception that Mr. Firstall said, I didn't even know of the prior complaints. There is not a shred of evidence that when the marshal service said, swearing in a public area, when you're an officer in the federal courthouse, and you go out in the public hallway, and you can't control yourself enough not to swear, and you go downstairs and you swear some more, there's not a shred of evidence that Mr. Firstall, when he made that decision, said, this is an embarrassment. There's not a shred of evidence. But how did it come to his attention? How did it come to his attention? I don't know. I don't think there's anything in the record how it came to Mr. Firstall's. Let me take that back, Judge White. How did it come to the marshal's attention? How did it come to the marshal's attention? I'm not sure, Your Honor, that that's in the record, how it came to the marshal's service's attention. I don't know if it's in the contract that they have a final say over who a COL employs in a particular facility. Not on the marshal's service contract, no, Your Honor. A COL has no discretion whatsoever to determine who can serve as a CSO. The record establishes that. I think when you say a COL has no discretion, who hires and fires the CSOs? I'll answer both questions. A COL hires and can fire CSO, but no court security officer on this judicial contract or any judicial contract may serve unless the United States government approves them. And on this judicial circuit and any judicial circuit... And why is that? We'd have to ask the marshal's service. That's in the contract between the marshal's service and the COL. That's what I asked you to begin with, is it in the contract? Yes, I'm sorry, Your Honor, I missed your question. It is in the contract, and we put that in the record. A COL, if the marshal's service says this person may not serve as a CSO on the contract, end of story. When you say, in this group, what group are you talking about? The group of CSOs who work in the control room? The group of CSOs at the district court? All the CSOs that work for a COL for this particular, you know, in Grand Rapids? I mean, who are you talking about? I apologize, Your Honor. When I said the group, what context, I'm not sure what context I used the word the group. I think I said it. Judge White asked you the question, and you responded by saying she was the only one in this group. I'm asking you who the group is. I understood the judge's question to mean at the CSO contingent at the federal district courthouse in Grand Rapids. That's who I understood the question to be. That's what the question was. Does anybody have any further questions? Okay. Thank you. Your Honor, in response to the question regarding the FPS, I want to make it clear that CSO Waringo was told when she asked, where would I report a crime which occurred in the federal building, she was advised that the Federal Protective Services is the criminal investigative arm of the federal court system, and that was the understanding that she had when she met with Mr. Roberts and told him of what happened. That was why she went to him. So I wanted to clarify that particular point. What crime did she think she was reporting? Sexual assault. Okay. Within the federal court. Your Honor, the other... CSO maintains that the first complaint was in February of, I guess, 2006. What can you tell us about what she complained about before and to whom? May I clarify? I believe what was said was the first complaint was in February of 2007. We would contend that CSO Waringo had filed complaints in November and December of 2006. And were they about promotion or about sexual harassment? They were about promotions, which she believed that she was being denied because of her gender, because of her being a woman, and because the promotions were always told, we've already picked so-and-so to get this promotion. The process of selecting and interviewing was... Those are, I mean, you would agree that those are two very different complaints. I mean, if administration gets a complaint about promotion, they open a file, they look at the qualifications, and they satisfy themselves okay. If it's about a hostile environment or harassment, then they have some action to take. Your Honor, I need you to recognize that the person making these complaints was not schooled as an attorney and was perceiving it from her own world experiences. When she wrote these complaints, that's what she said because that's what she believed. And now that we look at this as attorneys and experienced judges, we look at that in a different framework. We would acknowledge that there are differences, obviously. But when she saw that, she said, I'm never going to get a promotion because I'm a woman, and they don't want a woman to be a supervisor. That was her perception. Well, that's fine. But then that's a different complaint. I don't even mean legally. I mean factually. You're complaining that you're being passed over because you're a woman. Yes. You're not complaining that people are making your workplace hostile and you're being harassed because you're a woman. Well, Your Honor, within the context of realizing what was occurring at the end of November and December of 2006 and also that the sexual assault had occurred on November 1st, she was also now looking back and experiencing and had referenced in her complaint the good housekeeping thing about a woman's place. When was that? I believe that may have been in 2005 or even 2004. But then again, the comments about her ratty hair and why she was carrying an ugly purse and all these things that would have affected a woman in the way they did. But she, because she was a strong woman, I mean she was a sniper for the tactical unit of the Grand Rapids Police Department. She was a tough, strong woman. And she was trying to not be a complainer and a whiner. And these things just built up and built up, and they finally cascaded down upon her on November 1st when she was assaulted. And so that's when she began to explore the complaining part. Your Honor, I want to ask you to please consider our motion to compel and impose significant sanctions for the fact that four significant pieces of evidence were not turned over. I don't think this is the time for you to start a new argument. I appreciate your bringing it to our attention. Is there anything further? Thank you, Your Honor. Thank you both for your argument, and we'll consider the case carefully.